UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| NICOLE SYLVIA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )  Case No. 4:11-CV-1021 (CEJ) |
| | ) |
| MICHAEL J. ASTRUE, Commissioner | ) |
| of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I.  Procedural History

On June 18, 2007, plaintiff Nicole Sylvia filed an application for disability insurance benefits, Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, with an alleged onset date of January 23, 2006.  (Tr. 151-60).[1]  After plaintiff's application was denied on initial consideration (Tr. 91-93), she requested a hearing from an Administrative Law Judge (ALJ) (Tr. 101).

Plaintiff and counsel appeared for a hearing on March 11, 2009.  (Tr. 51-90). at the conclusion, the ALJ requested further medical evaluations.  A second hearing was held on November 19, 2009.  (Tr. 24-50).  The ALJ issued a decision denying plaintiff's claims on January 25, 2010 (Tr. 8-23), and the Appeals Council denied

---

[1]Plaintiff called the service center shortly after she filed her application to state that her alleged onset date was incorrect and requested that it be amended to January 2, 2001. The agency's Report of Contact notes that when plaintiff filed her application she had a "prior concurrent disability filing" that was denied on June 14, 2006.  As a result, her presumptive date of onset was June 15, 2006, and plaintiff's correction had no impact on her claim.  (Tr. 161).  At the first hearing, plaintiff reverted to the original onset date of January 23, 2006.  (Tr. 55).

plaintiff's request for review on April 5, 2011. (Tr. 1-6). Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II. Evidence Before the ALJ

### A. Disability Application Documents

In her Disability Report (Tr. 183-94), plaintiff listed her disabling conditions as chronic pain, depression, fibromyalgia, a brain stem tumor, seizures, fevers, carpal tunnel syndrome, weight gain and bed restriction. She stated that she was unable to work because she had severe migraine headaches and experienced constant, aching pain. She spent 70 to 80 percent of her time in bed. She was "ok" for one or two days a week, but even on those days she did not feel well. She had difficulty maintaining her balance and fell frequently. She "can't do much at all" and said that being in bed was her biggest problem. Her husband and children cooked for her. Plaintiff's medications included Flexeril for muscle spasms, Ibuprofen and Oxycodone for pain, and Lexapro for depression. (Tr. 191).

Plaintiff and her husband completed separate function reports which provided very similar information. (Tr. 209-16, 200-08). Plaintiff stated that when she woke up in the morning, she took her medication and returned to bed where she watched television. Her husband came home from work to fix her lunch. She spoke on the phone with her mother or a friend. Her husband prepares her dinners, after which she goes back to sleep. She sometimes watched television from the couch. She found it very depressing to always feel weak and to be in pain, and she worried about dying. It was difficult for her to dress or bathe and her husband had to wash her hair for her. He also had to remind her to take her medicine. The only household chore she completed was folding laundry, which she did while in bed. She left home only to go

-2-

to medical appointments, and never went out alone, because she was afraid of "attacks of high blood pressure [or] drop attacks." She no longer did any shopping. She had difficulties lifting, squatting, standing, sitting, using her hands, bending, kneeling, climbing, reaching, driving, reading, seeing, completing tasks, concentrating and understanding. She also had a poor memory. She sometimes used a cane or a brace when walking. In his report, plaintiff's husband noted that it was very stressful for him to support the family and provide the level of care his wife required.

On January 2, 2008, plaintiff completed a Disability Report -- Appeal (Tr. 233-40), in which she identified additional disabling conditions, including stomach pain, an increase in headaches, and problems with her hip and neck. She could not afford co-payments for her medical care and had declared bankruptcy. In a Function Report completed on November 18, 2008 (Tr. 241-48), plaintiff indicated that she continued to spend much of her day in bed, although she walked to the door to get her son to the bus stop every morning and prepared easy meals in the microwave. In other respects, her daily activities and limitations remained largely unchanged from her earlier report.

### B.  Hearing on March 11, 2009[2]

At the time of the first hearing, plaintiff was 39 years old. She lived with her husband and two of her three children, ages 17 and 8. Her middle child, aged 15, suffered from Tourette's syndrome and depression and resided with an aunt. Plaintiff left school before completing the tenth grade. (Tr. 58-60).

Plaintiff had last worked part-time at a Salvation Army thrift center hanging clothes and operating the cash register. Her previous work experience included a brief time as a salesperson and cashier for a jewelry store and two years as a supervisor at

---

[2]Tr. 51-90.

a K-Mart store. Her longest-held position was six or seven years as a full-time salesperson for a photography company.

Plaintiff testified that her medical difficulties began during her third pregnancy in 2002. (Tr. 71). Shortly after her child was born, her blood pressure surged and she was hospitalized. (Tr. 72). She began suffering from severe headaches that caused shooting pains. (Tr. 73-74). She was diagnosed with a Chiari malformation 1.[3] She had chronic nausea, and pain in her legs, arms, and torso. (Tr. 75, 77, 83). She was diagnosed with fibromyalgia and chronic pain syndrome. She testified that during flares she experienced so much pain that she had to go to the emergency room. (Tr. 76). She had crying spells, nausea, and vomiting about twice a week. She did not eat solid food and relied solely on nutrition drinks. (Tr. 85). She had lost 40 pounds in the last several months.

Plaintiff took Compazine for nausea and Tramadol for pain relief. Oxycontin was more effective, but she did not want to take a narcotic. She was not taking an antidepressant. She had taken "Lexapro for years [but] still had the pain, . . . still felt awful, and anybody would be depressed sick, anybody." (Tr. 78). She had not previously seen a psychiatrist and saw no need to do so, because her depression was due to chronic pain. (Tr. 87). She reported that she had no faith in physicians, whom she believed just wanted to push medicines on her. (Tr. 73). She worried that the pain medications were masking a more serious undiagnosed condition. (Tr. 75).

_____

[3]A Chiari malformation is a congenital anomaly in which the cerebellum and medulla oblongata protrude into the spinal canal. Type I involves the prolapse of the cerebellar tonsils without elongation of the brain stem. Dorland's Illus. Med. Dict. 1113 (31st ed. 2007). "Many people with Type I . . . are asymptomatic and do not know they have the condition." http://www.ninds.nih.gov/disorders/chiari/chiari.htm (last visited on March 29, 2012).

-4-

Plaintiff testified that she awoke at 6:30 in the morning.  Her pain was at level 10 on a 10-point scale.  She moved to the couch from which she guided her eight-year-old son through his morning routine.  She watched through the window as he boarded the school bus and then went back to bed to watch television.  Her children visited her in bed when they came home from school.  Her husband did all the grocery shopping and laundry.  She was able to drive but rarely did so.

## C.  Hearing on November 19, 2009[4]

When plaintiff appeared for the second hearing, she reported that she weighed only 109 pounds.  Since her last appearance, she had had surgery to repair a small hole in her bowel.  Her symptoms, which included nausea and diarrhea, were not improved.  She continued to have daily nausea and vomiting with abdominal pain that radiated into her legs.  She rated the pain at 9 on a 10-point scale.  She continued to spend all day in bed and had terrible headaches, depression, and daily crying spells.

The ALJ directed plaintiff's attention to a medical report that included the notation "malingering." (Tr. 34-36).  Plaintiff did not know who had written this in her record, but acknowledged that many doctors did not believe that she was sick.

Delores Gonzalez, M.Ed., a vocational expert , provided testimony regarding the employment opportunities for an individual with plaintiff's education, training and work experience, with the ability to perform medium work and  understand, remember, and carry out at least simple instructions and non-detailed tasks; adequate judgment to make simple work-related decisions; and the ability to adapt to routine, simple work changes and perform repetitive work.  Ms. Gonzalez opined that such an individual would be able to perform plaintiff's past relevant work as a video clerk, convenience

_____

[4]Tr. 24-50.

store clerk, and fast-food worker. The expert was next asked to assume that the individual was limited to light work and had the ability to maintain concentration and attention for two-hour segments over an eight-hour day; to respond appropriately to supervisors and co-workers in a task-oriented setting where contact with others is casual and infrequent; and to perform normal work at normal pace without production quotas. Ms. Gonzalez opined that such an individual would be precluded from performing plaintiff's past relevant work, but would be able to work as a cleaner or surveillance system monitor. In the final hypothetical, the ALJ asked Ms. Gonzalez to assume that the individual was unable to maintain concentration and attention for two-hour segments. She opined that this additional restriction would preclude employment. In response to a question from plaintiff's counsel, Ms. Gonzalez opined that an individual who had unscheduled absences once or twice a month would be unable to maintain employment.

### D. Medical Evidence

The ALJ and the parties confine their consideration of the medical record to entries in 2006 and subsequent years. The earlier entries indicate that plaintiff received extensive treatment for complaints of migraine headache, abdominal pain, and chronic severe pain in her arms and legs; she also had complaints of insomnia and depression. Numerous imaging studies and laboratory tests were negative. In April 2004, plaintiff underwent surgery to remove a benign growth on the parotid gland. (Tr. 318). In August 2004, Akgun Ince, M.D., diagnosed plaintiff with fibromyalgia. (Tr. 289-90). Plaintiff was diagnosed with bilateral carpal tunnel syndrome in August 2005. (Tr. 308). She had three polyps removed during a colonoscopy on June 20, 2006. (Tr. 437). In November 2006, an MRI of the brain disclosed a mild borderline

Chiari I malformation.  (Tr. 541).  The records indicate that throughout these years, plaintiff was prescribed Lexapro, Oxycontin, Cymbalta, Percocet, Darvocet.

On June 2, 2006, plaintiff was seen by Thomas J. Spencer, Psy.D., for a consultative evaluation.  (Tr. 311-14). Plaintiff reported that her physical problems began shortly after the birth of her third child and that she suffered from depression as a result of unresolved medical issues.  She reported that on a typical day she did nothing except watch television.  Her hygiene and grooming were "relatively intact." Although she was of average height and weight, she appeared to be five months pregnant due to abdominal distention, which she stated was not an uncommon occurrence.  On examination of her mental status, Dr. Spencer found that plaintiff was alert and oriented; her flow of thought was spontaneous and without loosening of associations or tangential or circumstantial thinking.  Her affect was dysphoric.  She appeared to be of average intelligence, and her reasoning abilities and memory were relatively intact, although she had difficulty with tests of recall and counting by serial 3s.  Dr. Spencer's diagnoses were major depressive disorder, recurrent, moderate to severe; rule out somatization disorder; and borderline personality traits.  He assigned a Global Assessment of Functioning (GAF) rating of 45-50.[5]

On December 6, 2006, Stanley B. Martin, M.D., completed a neurological examination of plaintiff.  (Tr. 442-43).  Plaintiff reported that she had right-sided headaches, pain in both legs, poor memory, diplopia, nausea, vomiting, numbness on her entire right side, and weakness in both arms and legs.  She denied having fevers,

---

[5]A GAF of 41-50 corresponds with "serious symptoms OR any serious impairment in social occupational, or school functioning."   American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th ed. 2000).

sweats or chills, and reported that her weight had been stable. On examination, her neurologic status, strength, muscle tone, and reflexes were all normal. Dr. Martin described her complaints as "difficult to characterize." He noted that plaintiff's brain MRI showed cerebellar tonsillar herniation of 5 or 6 mm, and opined that she did not exactly fit the definition for Chiari I malformation. He was "not enthusiastic" about surgery to correct the malformation as he thought the risks far outweighed the potential benefit.

Throughout 2007, plaintiff had regular office visits with Pierre Laughton, M.D., for complaints of pain, weakness, headache, fever, and fatigue. See Tr. 492-98, 629-39. In May 2007, plaintiff was evaluated by Pierre J. Moesser, M.D., for complaints of widespread body pain. (Tr. 568-69). She reported that she occasionally had flu-like symptoms, and felt as if she had a fever, although her temperature was normal. She had episodes of blurred vision, cough, heartburn, fleeting itchy rashes, neck and back pain, numbness and tingling throughout her body, and chest wall pains. On examination, plaintiff was alert and oriented, tearful, and in some degree of pain. She had full ranges of motion and normal muscle strength and tone. Only four out of eighteen trigger points were tender. On June 12, 2007, Dr. Moesser informed plaintiff that he did not believe that her Chiari I malformation explained her symptoms, and that she probably had a chronic pain syndrome such as fibromyalgia. Matthew L. German, M.D., who also evaluated plaintiff in June 2007, reported no abnormal findings beyond noting that plaintiff had multiple severe debilitating somatic complaints. (Tr. 665-66).

Between July and October 2007, plaintiff saw Dr. Laughton five times, with complaints of pain in her hips, legs, and neck, migraines, and spasms. (Tr. 629-38).

-8-

On September 16, 2007, plaintiff sought emergency treatment for migraine pain. (Tr. 795-97). She reported that her blood pressure was high, but it was normal when measured at the emergency room.

Ruth Stoecker, M.D., an agency medical consultant, completed a Physical Residual Functional Capacity form on October 15, 2007. (Tr. 606-12). Based on a review of the medical records, Dr. Stoecker determined that plaintiff had the ability to occasionally lift or carry 50 pounds and frequently carry 25 pounds. She was able to sit, stand or walk for about 6 hours in an 8 hour day. Dr. Stoecker found that plaintiff had no postural, manipulative, visual, or communicative limitations. In light of her carpal tunnel syndrome, it was recommended that plaintiff avoid concentrated exposure to vibration and limit the use of her upper extremities. In support of her assessment, Dr. Stoecker noted that plaintiff's allegation of chronic pain was unsupported by any diagnosis of a regional pain syndrome. In addition, despite her claims of illness, plaintiff failed to follow through on referrals to several specialists. Her claim that her medications kept her awake was deemed not credible in light of her use of narcotics. During a neurological evaluation in March 2006, plaintiff claimed she was too weak to lift her legs; however, she had bilateral Hoover's sign,[6] which indicated a lack of effort on her part. She repeatedly told physicians that she had multiple sclerosis and lupus, even though the relevant blood tests were negative. Plaintiff similarly claimed to have had a seizure without any substantiating evidence. Her allegation of "a tumor on her brain stem" was an exaggerated description of a benign

[6]In the normal state or genuine paralysis, if the recumbent patient is directed to press the whole lower limb against the surface, there will be a lifting movement in the opposite limb. This phenomenon is absent in hysteria and malingering. Dorland's Illus. Med. Dict. 1737 (31st ed. 2007).

-9-

parotid tumor and "borderline findings" of a Chiari I malformation. No objective medical evidence supported plaintiff's claim of extremely restricted daily activity.

On October 16, 2007, non-examining consultant Stanley Hutson, Ph.D., completed a Psychiatric Review Technique form. (Tr. 613-27). He opined that plaintiff had moderate limitations in the domains of daily living activities, social functioning, and concentration, persistence or pace, with no episodes of decompensation. He found that she had moderate limitations in her ability to manage detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual; work with others without being distracted; complete a normal work schedule and perform at a consistent pace without unreasonable rest periods; interact appropriately with the public; accept instructions and criticism from supervisors; get along with others in the workplace; maintain socially appropriate behavior; respond appropriately to changes in the work place; and set realistic goals or make plans independently of others. He further opined that plaintiff had a major depressive disorder and that an RFC assessment was necessary. In a narrative, Dr. Hutson explained that:

> She has worked and pain has been the focus of her treatment. She also has depression and takes medications from [her primary care physician]. Based on her mental disorder she has difficulty with interpersonal interaction; handling complaints or dissatisfied customers; close proximity to co-workers; and public contact. [She] can understand, remember, carry out instructions and persist at simple tasks; make simple work-related judgments; and adjust adequately to ordinary changes in work routine or setting. She is discouraged, stays in bed, and needs to be reminded, encouraged to do most things.

(Tr. 627).

Between February 8 and April 16, 2008, plaintiff made seven trips to the emergency rooms at St. Joseph's Health Center and Barnes-Jewish Hospital St. Peters. (Tr. 730-31, 786-89, 802-35). She complained of severe headaches, dizziness,

-10-

nausea, abdominal pain, weakness, back pain, cold feet, and palpitations.  Two visits
are of note.    On March 9, 2008, she was seen at Barnes-Jewish Hospital with
complaints of weakness and back pain.  (Tr. 802-06).  She weighed 145 pounds, the
same as she had in February 2008 (Tr. 786-89) and 21 pounds less than she weighed
in September 2007.  (Tr. 631-32).  Nonetheless, she reported that she had gained 13
pounds in the last 3 months.  She also stated that she had a "tumor on her brain
stem," presumably the Chiari I malformation.   Plaintiff reported that she had a
connective tissue disease or lupus.  On examination, plaintiff had normal strength
without any joint swelling or limitation in her ranges of motion.  Her gait was observed
to be steady.  Two days later, on March 11, 2008, plaintiff was admitted to Barnes-
Jewish Hospital with cholecystitis, nausea, and dehydration.   (Tr. 313-15).   A
sonogram detected gallstones and she underwent a laparoscopic procedure to remove
her gall bladder.   On March 14, 2008, she demanded to be discharged and rejected
further treatment.

The removal of plaintiff's gallbladder did not resolve her complaints of abdominal
pain.  (Tr. 824-30; 834-35 (two trips to emergency room with complaints of vomiting
or abdominal pain)).  Plaintiff consulted with Matthew H. Nissing, M.D., in April and May
2008.  (Tr. 743-54).  An upper GI endoscopy disclosed mild reactive gastritis and a
colonoscopy disclosed minimal patchy erythema.  (Tr. 752, 754, 757).  A CT scan of
the abdomen was negative.  (Tr. 678).  On May 13, 2008, plaintiff returned to the
emergency room at Barnes-Jewish Hospital St. Peters, seeking admission for treatment
of abdominal pain.  (Tr. 911-13).  The treating physician noted that plaintiff was "very
well known to our ER. . . She has been seen multiple times and says that the last time
she was here she was told she has pancreatitis and her Labs are abnormal.   Old

-11-

records reviewed and her amylase and lipase have all been [within normal limits]. [Plaintiff] is very argumentative and [states] that her labs are abnormal and I assured that they were not." Plaintiff was treated in the emergency room and discharged. Two days later, on May 15, 2008, plaintiff presented to the emergency room at St. Joseph's Health Center complaining of back and abdominal pain. (Tr. 690-94). Plaintiff underwent yet another CT scan of her abdomen, which was normal, as was an MRI completed the following week. (Tr. 678, 749).

Plaintiff had a pain management evaluation at Western Anesthesiology Associates, Inc., on May 8, 2008. (Tr. 767-70). On examination, she had a decreased range of motion of the cervical spine with pain on palpation. She exhibited a forward flexed gait and stance. She had full ranges of motion of the arms and legs, and normal muscle tone. There was no tenderness on palpation of the legs or lumbar spine. Rotation of the hips did not produce pain. Plaintiff was diagnosed with lumbar and cervical spondylosis[7] without myelopathy. She declined treatment with steroid injections and physical therapy. She was prescribed on Topamax and Zanaflex.

On May 20, 2008, Vincent F. Stock, M.A., completed a consultative psychological evaluation of plaintiff. (Tr. 659-64). Mr. Stock described plaintiff as cooperative, friendly, and well groomed, with agitated motor activity and labile affect. She made only intermittent eye contact and was somewhat disoriented. He diagnosed plaintiff with major depressive disorder and assigned a GAF of 45. He rated her mental abilities and aptitudes to perform even unskilled work as fair or poor and opined that she had

---

[7]Ankylosis [or stiffening] of the vertebra; often applied nonspecifically to any lesion of the spine of a degenerative nature. Stedman's Med. Dict. 1678 (27th ed. 2000).

marked restriction in her activities of daily living, moderate difficulties in maintaining

social functioning, and frequent deficiencies in concentration, persistence and pace.

On October 10, 2008, plaintiff returned to the emergency room at St. Joseph's

Health Center with complaints of abdominal pain.  (Tr. 706-11).  A CT scan and chest

x-rays were normal.  (Tr. 718, 671).  An endoscopy and duodenal biopsy on April 20,

2009, were normal.  (Tr. 863, 865).

On April 23, 2009, plaintiff saw L. Lynn Mades, Ph.D., for a consultative

psychological evaluation.  (Tr. 772-77).  Dr. Mades described plaintiff as well-groomed,

cooperative and pleasant, although tearful and labile.  She made good eye contact and

was alert.  She complained of hunger and an inability to eat due to nausea.  She was

very focused on physical symptoms.  Her speech and thought were spontaneous,

coherent, relevant and logical.  She showed no signs of delusions or thought

disturbance.  She had slightly limited insight and judgment.  Dr. Mades gave plaintiff

a diagnosis of undifferentiated somatoform disorder,[8] depressive disorder NOS, and

personality disorder NOS.  Her GAF was assessed as 60-65.[9]  "[Plaintiff] presents with

complaints of a variety of physical problems. . .  Records indicate several instances in

which her complaints were difficult to explain or seemed out of proportion to the

---

[8]In somatoform disorders, a patient exhibits physical symptoms that suggest a general medical condition and which are not fully explained by that condition or by another mental disorder.  See American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 485 (4th ed. 2000).

[9]A GAF of 61-70 corresponds with "Some mild symptoms . . . OR some difficulty in . . . social, occupational, or school functioning, . . . but generally functioning pretty well, has some meaningful interpersonal relationships." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th ed. 2000).

available evidence. . .  Personality issues are likely a contributing factor in her reported

difficulties."  Plaintiff's prognosis was fair if she received appropriate intervention.

On April 30, 2009, plaintiff underwent a laparotomy with lysis of an adhesive

band discerned in her abdomen that caused her intestines to be tucked into the upper

right quadrant of her abdomen.  (Tr. 932).  A month later she reported only slight

improvement in her symptoms.  (Tr. 878).

### III.  The ALJ's Decision

In the decision issued on January 25, 2010, the ALJ made the following findings:

1.    Plaintiff last met the insured status requirements of the Social Security
      Act on June 30, 2009.

2.    Plaintiff did not engage in substantial gainful activity between her alleged
      date of onset of January 23, 2006, and the date she was last insured.

3.    Through the date she was last insured, plaintiff had the following severe
      impairments: fibromyalgia, residuals of laparoscopy, major depression,
      borderline personality disorder, and somatoform disorder.

4.    Plaintiff did not have an impairment or combination of impairments that
      met or substantially equaled one of the listed impairments in 20 C.F.R.
      Part 404, Subpart P, Appendix 1.

5.    Through the date she was last insured and after, plaintiff has had the
      residual functional capacity to perform light work except that she must
      avoid concentrated exposure to vibrations.   She can maintain
      concentration and attention for two-hour segments over an eight-hour
      period and can respond appropriately to supervisors and co-workers in a
      task-oriented setting where the contact with others is casual   and
      infrequent.  She can perform work at a normal pace without production
      quotas.

6.    Through the date she was last insured, plaintiff was unable to perform
      any past relevant work.

7.    Plaintiff was 39 years old on the date she was last insured and is thus a
      younger individual.

8.    Plaintiff has a limited education and is able to communicate in English.

9.    Transferability of job skills is not material to the determination.

-14-

10.     Through the date she was last insured and considering her age, education, work experience, and residual functional capacity there are jobs that exist in significant numbers in the national economy that she could have performed.

11.     Plaintiff was not under a disability, as defined in the Social Security Act, from January 23, 2006, through June 23, 2009.

(Tr. 13-18).

## IV. Discussion

To be eligible for disability insurance benefits, plaintiff must prove that she is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382(a)(3)(A) (2000). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner employs a five-step evaluation process, "under which the ALJ must make specific findings." Nimick v. Secretary of Health and Human Servs., 887 F.2d 864, 868 (8th Cir. 1989). The ALJ first determines whether the claimant is engaged in substantial gainful activity. If the claimant is so engaged, she is not disabled. Second, the ALJ determines whether the claimant has a "severe impairment," meaning one which significantly limits her ability to do basic work activities. If the claimant's impairment is not severe, she is not

-15-

disabled. Third, the ALJ determines whether the claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the claimant's impairment is, or equals, one of the listed impairments, she is disabled under the Act. Fourth, the ALJ determines whether the claimant can perform her past relevant work. If the claimant can, he is not disabled. Fifth, if the claimant cannot perform her past relevant work, the ALJ determines whether she is capable of performing any other work in the national economy. If the claimant is not, she is disabled. See 20 C.F.R. §§ 404.1520, 416.920 (2002); Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).

## A.    Standard of Review

The Court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)). If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Court must affirm the decision of the Commissioner. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

## B.    Plaintiff's Allegations of Error

Plaintiff contends that the ALJ (1) improperly evaluated her mental impairments; (2) improperly evaluated the opinions of the consultants; (3) improperly rejected

-16-

plaintiff's allegations of disabling pain; and (4) should have issued a partially favorable decision rather than a denial.

### 1.    Plaintiff's Mental Impairments

The ALJ found that plaintiff had three severe mental impairments: major depression, borderline personality disorder, and somatoform disorder. He also found that plaintiff was mildly restricted in the domains of daily living activities and social functioning, and moderately restricted in the domain of concentration, persistence, or pace. (Tr. 14). This assessment is consistent with the finding of examining consultant L. Lynn Mades, Ph.D., that plaintiff's GAF was 60-65.

Plaintiff first contends that the ALJ neglected to apply the special technique for evaluating a claimant's functional limitations due to mental impairments. 20 C.F.R. § 404.1520a. This claim is without merit. The regulation sets out four domains of functioning that must be evaluated: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. § 404.1520a(c)(3). The ALJ made specific findings with respect to all four domains and thus properly applied the regulation.

Plaintiff next argues that the ALJ's findings that she had only mild restrictions in the areas of daily living activities and social functioning contradict his determination that she had "severe" mental impairments. Plaintiff cites the following statement from § 404.1520a: "If we rate the degree of your limitation in the first three functional areas as 'none' or 'mild' and 'none' in the fourth area, we will generally conclude that your impairment(s) is not severe." 20 CFR § 404.1520a(d)(1). However, the ALJ found that plaintiff had a moderate degree of impairment in the functional area of

-17-

concentration, persistence, and pace.  Plaintiff's contention that the ALJ's decision contains an internal contradiction is incorrect.

### 2.   Consultants' Opinions

The record contains four psychological evaluations.  In October 2007, non-examining agency consultant, Stanley Hutson, Ph.D., reviewed the records and opined that plaintiff had moderate limitations in several functional areas as a result of her mental impairments.  Plaintiff was examined in June 2006 by Thomas Spencer, Psy.D., in May 2008 by Vincent Stock, M.A., and in April 2009 by L. Lynn Mades, Ph.D.  Dr. Spencer and Mr. Stock assigned plaintiff a GAF of 45 while Dr. Mades assigned a GAF of 60 to 65.

The ALJ did not address Dr. Hutson's report.  Plaintiff contends the ALJ committed reversible error by failing to address the report and give adequate reasons for rejecting its findings.  See 20 C.F.R. § 404.1527(d) ("Regardless of its source, we will evaluate every medical opinion we receive.").  Defendant acknowledges that the omission is an error but argues that it is a harmless deficiency in opinion-writing.  The Court agrees.  First, the regulations provide that the opinion of an examining source such as Dr. Mades is entitled to greater weight than that of a non-examining source such as Dr. Hutson.  See 20 C.F.R. § 1527(d)(1) (opinions of examining sources given greater weight than nonexamining sources).  See also Wildman v. Astrue, 596 F.3d 959, 967-68 (8th Cir. 2010) (ALJ did not err in rejecting opinion of non-examining sources).  In addition, Dr. Mades had the benefit of reviewing records of plaintiff's additional care between October 2007 and April 2009.  See id. ("Here, we find it significant that the state agency evaluators did not have access to [subsequent] medical records").  For these reasons, the ALJ would have been justified in giving

-18-

greater weight to the opinion of Dr. Mades over that of Dr. Hutson. Thus, the failure to address Dr. Hutson's opinion had no practical effect on the outcome and is harmless error. Senne v. Apfel, 198 F.3d 1065, 1067 (8th Cir. 1999).

Plaintiff also argues that the ALJ erred by affording greater weight to the opinion of Dr. Mades than to the opinions of Dr. Spencer and Mr. Stock. "It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians." Wagner v. Astrue, 499 F.3d 842, 848 (8th Cir. 2007) (citations omitted). The ALJ appropriately determined that the opinion of Dr. Mades was entitled to greater weight than those of Mr. Stock and Dr. Spencer. As noted, Dr. Mades had access to extensive medical records. By contrast, Mr. Stock was not provided any reports and Dr. Spencer had access to a single medical records report. (Tr. 772, 661, 311). In this case, the medical records are crucial for accurately assessing plaintiff's level of impairment because there is evidence that her reported experience varies significantly from any medically determinable conditions. The ALJ's decision to place greater weight on the opinion of Dr. Mades is supported by substantial evidence.

### 3. Plaintiff's Allegations of Pain

Plaintiff asserts that the ALJ improperly discounted her allegations of pain, whether "real or somatic."

A disability claimant's subjective complaints of pain may be discounted if inconsistencies in the record as a whole bring those complaints into question. Gonzales v. Barnhart, 465 F.3d 890, 895 (8th Cir. 2006). Although an ALJ may not disregard subjective pain allegations solely because they are not fully supported by objective medical evidence, an ALJ is entitled to make a factual determination that a claimant's

subjective pain complaints are not credible in light of objective medical evidence to the contrary. Id. (quoting Ramirez v. Barnhart, 292 F.3d 576, 581 (8th Cir. 2002)).

In this case, the ALJ noted that the record contains no findings of significant musculoskeletal, neurological, or rheumatological abnormalities. In addition, plaintiff routinely declined to follow the advice of medical providers. For example, she refused steroid injections and physical therapy to achieve better pain control. (Tr. 650-53). Following gallbladder surgery, she rejected further treatment and demanded release from the hospital. (Tr. 813-15). On another occasion she reported that she had discontinued a prescribed medication. (Tr. 741-42). At least one medical provider described plaintiff as malingering. The ALJ declined to ascribe plaintiff's complaints to malingering and noted that her pain and physical symptoms were probably the result of a somatoform disorder. Id. Nonetheless, plaintiff's insistence upon physical symptoms far in excess of a medically determinable condition detracted from her credibility regarding her level of pain. See Baker v. Barnhart, 457 F.3d 882, 893 (8th Cir. 2006) (report of symptom exaggeration provides good cause to discount subjective complaints of pain). With respect to the role played by her psychiatric complaints, the ALJ noted that plaintiff refused to seek appropriate care despite her own subjective experience of debilitating symptoms and extreme restriction in the activities of daily life. This lack of psychiatric treatment detracted from her credibility. See Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000) (absence of evidence of ongoing counseling or psychiatric treatment or of deterioration or change in claimant's mental capabilities disfavors finding of disability).

The ALJ's finding that plaintiff's allegations of disabling pain were not credible is supported by substantial evidence in the record.

### 4.    Partially Favorable Decision

Plaintiff asserts that she was entitled to a "partially favorable decision" rather than a denial. As support of this argument she cites an agency report dated December 18, 2008, stating, "Based on the evidence in the file, it appears that the claim could be allowed on the basis that the claimant cannot sustain work-related activity . . . due to significant and persistent symptoms associated with her physical and mental impairments." (Tr. 252). The report's author noted, however, that the record did not establish any severe restrictions based on a mental impairment until Mr. Stock's report in May 2008, fully seven years after plaintiff's alleged date of onset. Thus, "a fully favorable decision cannot be made [and] the file is being returned." Id. As explained above, the ALJ's decision not to rely on Mr. Stock's opinion is supported by substantial evidence in the record and the Court cannot say that the ALJ erred by declining to award a closed period of benefits.

### V. Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole. Therefore, plaintiff is not entitled to relief.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by plaintiff in her brief in support of complaint [#7] is **denied**.

A separate judgment in accordance with this order will be entered this same dat

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 13th day of June, 2012.

-21-